The next case on calendar for argument is Chao v. Matheson. Good morning, Your Honors. My name is Bob Kabosvich. I'm representing the Mathesons in this case. I'll try and keep a few minutes for rebuttal. The issues here are primary, and of course, as the courts have read the briefs, whether the Donaldson and the Coeur d'Alene case, Donovan-Coeur d'Alene case applies, we of course contend that it cannot apply, and the reason is the treaties and the internal matters distinguish Donovan from this case. I've cited in the briefs the Medicine Creek Treaty, the treaty itself, and of course it's a living document, and it states that there's orders of exclusion. You can exclude non-Indian people. It also states that Canadian Indian people cannot reside on the reservation. It talks about workers. At Article 11, it says there can be no slaves. That would be a working situation a little bit oblique. That's a little far-fetched, I think. Yes, I agree with you, Your Honor. However, my point is that workers were contemplated 150 years ago in the treaty, and that's why I think this case is... You equate slaves with employees? They're working for nothing, Your Honor. That's my point. I presume that employees on the Indian reservation are not slaves. They're working for something. They're making money. They're paying taxes. Well, that's correct, Your Honor. They'd be working for nothing. I don't think you equate slaves with employees. I hope. But workers, Your Honor, and I apologize if this is not, it may be insensitive, but at least, I know I'm repeating, the idea of people on the reservation was 150 years ago written about in the treaty. Well, look, counsel, I understand that, but I'm just saying that you made a comparison. We're looking at this treaty today. We're looking at it in light of what the Supreme Court has said. And your analogy appears to be that because the treaty precludes the tribes that live on this reservation from maintaining slaves, that somehow that is supposed to be a quid pro quo suggestion that the treaty talked about workers, employees. And I'm having a hard time equating not maintaining slaves with employee rights. Your Honor, I apologize if I've made a distortion in my argument. But one of the main issues that I want to emphasize in the treaty is the ability to exclude non-tribal members. And that's the more important point. Well, look. If they could do that, all right. But here, they were employing non-tribal members in their business as well as tribal members. Is that not accurate? That's right, Your Honor. And I submit that that is not a good reason. Because if, say, someone is employed who's a Canadian person, does that law follow the employees? This is an Indian-owned business taking place only on the Puyallup Reservation. And where these people reside is not the point. They're all employees of this Indian-owned organization. Let me ask you this question, Counsel. If a Canadian comes and works, a Canadian comes down here and lawfully becomes employed, say, here in Seattle, doesn't the Fair Labor Standards Act apply to the Canadian? Does it apply to anybody else? That's right, Your Honor. Don't they pay minimum wages?  Well, what's the difference? The difference, Your Honor, is that we have an Indian-owned business taking place on the reservation. And I'm not a tribal member. If I go to work for that Indian organization, I have to succumb to the laws and the rules of the Indian tribe and the Indian organization. But doesn't it matter as to what capacity you're working? All right. Let's say you're working as a police officer. That's an inherent, sovereign, tribal activity, the courts have said, which is not subject to necessarily certain laws of general applicability. But here we have a smoke shop which is catering in large measure, actually, to non-tribal members, people coming from the community outside the reservation to buy goods from this particular store. That's how they stay in business. So not only are they performing a typical business function, they're doing it with, as Judge Fletcher pointed out, non-Native American employees serving non-Native American customers that they want to come onto the reservation to use their product. And they're purchasing product off the reservation. They accept credit cards. They use the wires. I mean, the only distinguishing feature we have here is that it happens to be located on the reservation. But outside of that, it's a typical business. Your Honor, that's correct, but it's Indian-owned. Now, listen to what the court said. Let's say this was in Blaine, Washington, right by the Canadian border. And most of the customers, say over 50 percent, were Canadian people. It wouldn't make no difference. I submit that your residency of your customers makes no difference in this case. Because what difference does it make? If I go down to North Shore, it doesn't make any difference where I came from. The central core of your argument, however, is that this is a core tribal activity. That's what's key here as to whether laws of general applicability apply. That's correct, Your Honor. Right? And I submit it's a first. That makes it a bit different than just our cross-border argument that you made. Exactly, Your Honor. How is owning a smoke shop, which caters to, which employs people outside of the reservation as employees, and which operates as a standard business, and caters to people outside of the tribe, a core tribal activity? Your Honor, because it's, and this is why this case is a first impression, the Mathesons are controlled by the Puyallup tribe. And this is an entity that is controlled by the tribe itself, which makes it inherently between tribe, and they issue a license to the Mathesons to do business. And that makes it much different than the other cases involved here. Again, they're interfering between the Indian tribe and the Indian person who runs a business on the reservation who's a tribal member. Well, this might be a different case. If, for example, the Pierce County said you can't operate if you don't have a license, then I think I would agree with you that they're beginning to intrude on the tribal functions, the tribe's business as to who they'll give a license to operate a store. But here, we're looking at all product comes in from the outside. It's a regular commercial business employing both Native Americans and outside employees. It just doesn't seem that this goes to the core function, and that's what you have to persuade us of. Your Honor, I would attempt to persuade the court in the basis that, from what the court said, that would eliminate the reservation as a governmental entity. No, not at all. Now, the tribe doesn't have regulations about wages, does it? It hasn't intruded into that area. We might have a real problem if, say, the tribe required more overtime than the FLSA. We'd say maybe the tribe is making that governmental decision. But there's none of that here. To my knowledge, Your Honor, no. There are no regulations regarding employees of an Indian business. The Indian-owned businesses on reservation are very few. I would cite to the court, however, the Babbitt-Ford case, which I argued in my brief, 710 Federal 2nd 587. That talked about, and that's the second part of my argument, the government, the wage and hour people have tried to appoint a receiver. Babbitt-Ford says that that collection on a reservation is governed by the reservation rules. I think there's a real problem with the receiver having been named here. I think that that's what your core argument should be about. I think the court's right. I debated on this argument as to whether to talk about wage and hours. I still think it's wrong. I think by far my strongest argument is that the court went way beyond its jurisdiction. The wage and hour people say there's inherent authority. There is not inherent authority to usurp the collection on a reservation. As a matter of fact, the Puyallup tribe rules say you can only collect 10% of earnings, and there's all kinds of rules regarding going on the reservation to collect something. Well, I'm not so sure that it's inappropriate to appoint a receiver in an appropriate case, but in this case, the receiver was appointed before there was even a default. That's correct, Your Honor. Essentially. And if they can't pay, there's bankruptcy and all the other things that normally have to do with collection. And I think that the court was completely wrong on that issue. Has this issue come up in connection with casinos, do you know? Pardon me, Your Honor? Has the issue about FLLSA applying to casinos, has that come up? I don't know, Your Honor. I can't recall any situation on that. So this may have some significance beyond the smoke shops. Well, there are cases in the pipeline, Your Honor, that have not yet been able to be cited on the wage and hour people on casinos. There are some cases in Spokane that are in the pipeline, and so it could have significance. I'm not aware. I don't think there's any. There are reported decisions, but none that are precedential at this point. I really don't want to abandon the wage and hour issue. I can tell the court that once we found out what was wrong, we remedied immediately. This is not an ongoing violation. We're kind of in a gotcha situation. Once we found out what the issue was, we changed the hours and so on and so forth. I'll reserve the rest of my time. All right. May it please the Court, Gregory Jacob for the Secretary of Labor. The conclusion that was reached by the district court below, that the Fair Labor Standards Act fully applies with all of its requirements to Baby's Act smoke shop. Are there cases which have applied this? The Fair Labor Standards Act? Does it apply? There are, Your Honor. Not in the Ninth Circuit, though. No. This is an issue of first impression in the Ninth Circuit, although we have enforced, it's not in the record, but we have enforced the Fair Labor Standards Act against casinos on the Puyallup tribe lands in the past and have had no issues with that. But the stipulated facts below, combined with this circuit's settled precedent, dictate the conclusion that was reached by the district court that the Favor of Labor Standards Act applied. And because the stipulated facts are both important and brief, I want to recount them here. First, that Baby's Act smoke shop is owned not by the Puyallup tribe itself, but rather by Paul Matheson, who is simply an enrolled member of the tribe. Second, that it is a commercial retail business, doing more than $500,000 in business a year to both tribal and non-tribal members. And third, that it is an employer within the meaning of the Fair Labor Standards Act and employs both tribal and non-tribal members that the Fair Labor Standards Act must govern. If this were owned by the tribe, what then? It would make no difference with respect to the application of the Fair Labor Standards Act. And in fact, in past cases that have been decided by this court, for example, in the Warm Springs case, which involved a furniture operation that was owned by the Warm Springs tribes there, this court had no problem applying ERISA as a statute of general applicability to those facts. The ownership of the tribe is not the material question. Rather, as this court was asking of opposing counsel, the question is whether it goes to either a treaty right on the one hand that is encompassed within a treaty with the United States, or, on the other hand, if it goes to the intramural affairs and rights of self-governance. To the extent that the tribe enters into the commercial market, and again, that's not the case that we have here, but if it were to enter into the commercial market, then the Fair Labor Standards Act would apply as would all of the other generally applicable statutes. Counsel, could you address the receiver issue? Because I see that as more problematic for you. I would, Your Honor. And the first thing to point out is that the district court did not actually appoint a receiver yet. The appointment of a receiver was made entirely conditional in the district court's order, which explicitly states that it is further ordered that if the defendants fail to make the payments as set forth above, the court shall appoint a receiver. Now, if the court were not allowed to appoint a receiver under those circumstances, much as if their argument about a right to exclude OSHA investigators, which was repudiated by this court in Corte D'Alene and in the Department of Labor v. Osherick case... Well, as a procedural matter, though, before appointing a receiver, aren't there preliminary proceedings that are required? You know, for instance, a bond, a posting of a bond, a notice that a receiver is going to be appointed. There have been no arguments in this case that have been made as to any procedural requirements that were violated in the appointment. Isn't that the problem? No, I don't think it is, Your Honor. I think the argument that was made with respect to the appointment of a receiver... And again, no receiver has been appointed yet. A receiver has been conditionally appointed in the event that they fail to make payments properly. Did you ask for a receiver? No, we did not, in fact. We asked for equitable relief and the court in its powers stated and to ensure that in the event that they did not properly make their payments, that a receiver would be appointed. The argument that opposing counsel has made that the appointment of a receiver somehow abrogates a treaty right of the tribe to avoid forfeitures of tribal land. But in fact, the appointment of a receiver does not at all necessarily lead to that conclusion. If a receiver were to be appointed, the first thing that a receiver would do would be to go through the books of Mr. Matheson at a Babysack Smoke Shop and try to go into accounts. They wouldn't even necessarily need to liquidate any assets. They would hopefully... This seems very odd because in most cases you leave it up to general enforcement of judgments and there's no suggestion here that these people aren't going to pay. It seems to me that it's overreaching by the court to even say he's going to appoint a receiver at this time if they don't pay. It seems to me that the appropriate time is when the smoke shop refuses to pay. Then there is reason to go in and argue these things out with the court, but at this point I think it's overreaching. Your Honor, I certainly have not researched the procedural requirements for appointment of a receiver because they have not been briefed, have not been raised by opposing counsel. It was done without the parties having requested or addressed it. But as a legal matter we can still decide whether or not the requirements were met for even the conditional appointment of a receiver. I'm not so sure we even need to get to the question or even it is appropriate to get to the question of whether or not a receiver is authorized because of certain tribal issues under federal law where here it appears that there were procedural requirements that may not have been met. So you don't even get there. Again, if the court in its discretion would like to address procedural issues that haven't been briefed, I leave that to the court. The one thing that I would ask, though, is that the court not get to if it is going to address those procedural matters that it not find that there is actually a substantive prohibition against appointment of a receiver because it is important. I don't think we need to reach that issue and I think it might be a real issue, but I don't think we need to get there. I hope that that is the case, Your Honor, because, again, it is important that at the end of the day the Department be able to have recourse in the event that Baby Zak Smoke Shop does not, in fact, comply with the court's order. The ordinary recourse of going in there and executing on the property is not a huge bill. Well, again, their whole point or their argument in this case is that we can't levy upon the property. That is their substantive argument against the appointment of a receiver in the first place. That is a different matter. Appointing a receiver is a different matter than executing on a judgment. Go ahead. Judge Rollinson was the distinguished district judge, so she knows more than I do about that. Let me say that in every case, in every civil case where you get a judgment, then that goes up on appeal. If you are successful and you've got your judgment, then you come down and you execute on the judgment. If you're unsuccessful in executing on the judgment and somebody has a legal reason why, then that is litigated. You don't kind of litigate it all on the theory that something may happen that hasn't happened. It's speculation as to whether or not they will pay or have the money to pay. Isn't that true? We absolutely agree. It's totally speculative. Judges don't normally decide issues in federal court that are not cases or controversies. We don't even know whether they're going to pay. I'm wondering why a receiver was appointed other than to simply hold an axe over their head. As Judge Fletcher indicated, this was not relief that the department specifically requested that the court enter. It's certainly not key to the department's position if the court wishes to object to that on procedural grounds. The department has no problem with that. We can deal with it as we go down the road. We don't object. We'll make a ruling. If the court strikes it down for procedural flaws, as long as we don't get to the substantive issue, just to make sure that the department ultimately has recourse to make sure that the employees have the remedies that they're entitled to as a matter of law. Getting back to the non-receiver issues on the application of the Fair Labor Standards Act, just to quickly run through the standards, although I think they've been thoroughly vetted during opposing counsel's argument. The foundational rule, of course, set out by the Supreme Court in the Tuscarora case, is that a statute of general applicability applies to Indians and non-Indians alike so long as the statute is silent on the matter of addressing application to Indians. And in this court itself, in the Snyder v. Navajo Nation case, decided that the Fair Labor Standards Act is a statute of general applicability. So the only question is whether the Fair Labor Standards Act falls within one of the three exceptions that have been articulated by this court. The third of those exceptions are not argued by opposing counsel, which is if there's legislative history indicating that Congress didn't intend the statute in question to apply to Indians. And so that's not before the court. But the other two exceptions have both been argued. First, this somehow touches on intramural matters of self-governance by the Indian tribe. Now, the key here is that this is a regular commercial business operation which employs Indians and non-Indians, serves Indians and non-Indians. This is not an arm of the government. And the only instances in which this court has found the intramural exception to apply have been in cases where it has been an actual arm of the government, police officers or a housing authority of the tribal government that has been at issue. So this exception clearly does not apply here. In fact, this court has already found that the Occupational Safety and Health Act, ERISA, and the National Labor Relations Act all can be applied to tribes under similar circumstances. The stronger argument pressed by opposing counsel is that the application of the Fair Labor Standards Act would abrogate the Puyallup tribe's treaty rights. I think for all of the reasons this court pointed out in their argument that the fact that it dealt with and that the Treaty of Medicine Creek required the Puyallup tribe to divest themselves of all of their slaves did not somehow preempt the field of labor relations and prevent the application of any of the general applicable statutes in that field. But it also argues that the Treaty of Medicine Creek gave the tribe a right to exclude white men from the reservation lands and that that somehow prevents the application of the Fair Labor Standards Act. In fact, this court dealt with that very issue in the United States Department of Labor versus Occupational Safety and Health Review Commission case interpreting identical language in the treaty with the tribes of Oregon and found that, in fact, there is no right to exclude federal investigators with respect to Occupational Safety and Health Act investigations. And the one thing I'll let the court know is that wage and hour investigations tend to be much less intrusive than Occupational Safety and Health Act investigations, which have already been upheld because we typically simply request that records be sent to us, which we review, before we move on, as opposed to the Occupational Safety and Health Act, where they actually enter into the business and survey the business in its entirety. It's implicit in the right to enforce the statute as a whole that we'd be able to conduct those investigations. And, in fact, if we weren't able to send people in, it would effectively abrogate the ability to enforce the Fair Labor Standards Act or any of the other generally applicable statutes that do apply. Unless the court has any other questions, then, I will simply ask that the court affirm the district court's decision below that the Fair Labor Standards Act applies, noting the caveat that the Department's just fine with that. Thank you. I'd like to re-stress, though, the importance of the treaty. And the Kanauma case that I've cited in the brief had to do with real estate taxation. I believe it's a Sixth Circuit opinion, which I realize I'm not finding on this court. Historically, again, this 150-year-old document is still operative. And Kanauma said we should go back and look at the conditions at the time the treaty was entered. We have here Indian people who are going to be pushed off into a smaller park to get rid of them running around the plains and so forth. So, one of the big issues, there was fighting going on. There's even chronicles where the Governor Stevens reported that he lopped off a bunch of Indians' heads and sent them to Olympia. So there was strife going on here. And so the United States said, come over here on this area, this reservation, and we won't bother you. Now, granted, that's 150 years ago. But that's what the Department of Labor is saying. We're going to go on there and we're going to tell you how to run your business. And the second answer is that there is a great difference, I realize it's re-stressing, between an Indian-owned business. They have to answer to the tribe. So how do they answer to the tribe on one situation and Labor and Ours on another? I submit this is a... Excuse me. In answer to Judge Fletcher's, I think, very important question, you had to acknowledge that the tribe hasn't intruded into this area. That's correct, or at least to my knowledge. Well, it's not a situation where the federal government is attempting to supplant the tribe. The tribe doesn't do anything here. Does it mean if the tribe doesn't treat an issue the federal government can control it? That's not what Donovan says. Well, I didn't say that, but if you have a law of general applicability and you've got a commercial enterprise where people are catering to both tribal and non-tribal entities and employing tribal and non-tribal entities, I think Congress may well have a say so there. I submit it's an internal tribal Indian business matter. Thank you, Your Honors, for listening to the argument. Thank you. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case on calendar for argument is Rogers v. Dahlke.
judges: Fletcher, Rawlinson, Ezra